BOWERS v. LAKE SUPERIOR CONTRACTING & DREDGING CO.

(Circuit Court of Appeals, Eighth Circuit.   November 21, 1906.)

No. 2,322.

1. PATENTS—LICENSES—ASSIGNABILITY.

A license to use a patented invention that does not contain words importing assignability is a grant of a mere personal right to the licensee, which does not pass to the licensee's heirs or representatives, and which cannot be transferred to another without the express consent of the licensor.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 316.

Sublicensees and assignment of licenses for use or sale of patents, see National Phonograph Co. v. Schlegel, 64 C. C. A. 596.]

2. SAME—UNASSIGNABLE LICENSE—CONDUCT OF PARTIES.

A continuing assignable quality may be given to a license to use a patented invention originally unassignable, by facts and circumstances and the conduct of the parties during the continuance of the license.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 320.]

3. SAME—ASSIGNMENT.

Plaintiff executed a license authorizing B. to use certain patented inventions in connection with a hydraulic dredge, on payment of certain royalties. This license was not assignable, and after certain royalties had become due and were unpaid B. requested certain changes in the contract, including the insertion of words authorizing an assignment, which plaintiff agreed to make on B. sending a draft for the royalties then due, with accrued interest. B. did not pay such interest, however, and was never notified that it had been waived, but on B.'s death his executrix continued to operate the dredge and another dredge purchased, which, also, contained certain of the patented inventions, and paid royalties thereon, after which she transferred the dredges to defendant corporation under a bill of sale passing the entire dredging plant, business, and contracts, and all licenses to practice or enjoy patented inventions, together with the license papers. Defendant, with knowledge that executrix had been operating under the license and that she asserted a right to transfer and had made manual delivery thereof, continued to operate the dredge and patented appliances without disavowal of responsibility, or repudiating responsibility for royalties, which plaintiff thereafter demanded. *Held*, that defendant should be regarded as a licensee and as such was liable for royalties.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 38, Patents, § 320.]

**4. SAME—ROYALTIES—AMOUNT.**

Plaintiff executed an unassignable license, authorizing B. to use certain patents on dredging machines which had been installed on a hydraulic dredge known as the "West Superior"; B. agreeing to pay specified royalties therefor. · B. thereafter applied to have the license made assignable, and for reduction of the royalty rate, which plaintiff refused to do unless B. paid certain interest on past-due royalties and equipped another dredge of a specified capacity. B. performed neither of these conditions, but later purchased a dredge containing certain of the patented inventions which had been emancipated from further payment of royalties, but which was scarcely half the capacity required by plaintiff in his offer to reduce, after which both B. and his executrix paid royalties at the reduced rate until the executrix transferred all the dredges, licenses, etc., to defendant corporation with plaintiff's consent. *Held*, that there was no valid contract for the reduction of the royalty rate, and that defendant was therefore liable only for royalties on the work done by the original dredge at the price originally fixed in the license.

In Error to the Circuit Court of the United States for the District of Minnesota.

This was an action by Alphonzo Benjamin Bowers against the Lake Superior Contracting & Dredging Company to recover royalties alleged to be due under a license for the use of certain patented inventions connected with hydraulic dredges. At the conclusion of the evidence the trial court directed a verdict for the defendant, and the plaintiff prosecutes this proceeding in error.

Bowers was the owner of a number of patents on dredging machines, and one Barker was the owner of a hydraulic dredge known as the "West Superior," which contained some of the patented features and which he had been operating without the consent of Bowers in the performance of a contract with the United States to do certain dredging work in the harbors of Duluth and Superior at the western end of Lake Superior. In May, 1899, Bowers and Barker entered into a contract embracing a settlement for past violations, and granting to Barker a license to use the patented inventions on Lake Superior and tributary waters for the remainder of the terms of the patents. The license ran to Barker alone, and not to his heirs and assigns. It was therefore not assignable. The agreed royalty was one cent per cubic yard of material excavated under the government contract, and 2½ cents per cubic yard of material excavated under other contracts. Barker operated under the license during the season of 1899. In the autumn of that year he requested by letter certain changes in the contract of license, and on November 9, 1899, Bowers replied, granting his request only in part, and authorizing the interpolation in the written contract of certain words, among which were "heirs, representatives and assigns," for the purpose of making the license assignable. Bowers' consent to this, however, was conditional. After saying that he expected interest at the rate of 7 per cent. upon the several amounts of royalty then past due and unpaid, he concluded his letters as follows: "Please send me drafts for these sums with said interest. The aforesaid changes in the license are to be made and become effective only on receipt of said draft by me." One of the important questions in the case is whether this modification ever became effectual.

June 18, 1900, Bowers made a written proposition which was accepted by Barker, the licensee, that after that month he would allow a rebate of a half cent per yard on the government work provided the latter promptly made his monthly payments of royalty, and also had at the commencement of the season of 1901 a second dredge of specified capacity ready for work, the reduced rate to apply to the government work done by both dredges. During the remainder of the season of 1900 Barker operated the West Superior dredge and paid royalty at the half-cent rate. Before the next season opened Barker bought a dredge known as the "Northwestern," which had been built some years before under license from Bowers and emancipated from further payment of royalty by the payment of a lump sum. Barker then died, leaving a will wherein his wife was named executrix. Mrs. Barker, having qualified, operated both dredges during the entire season of 1901, the West Superior on

government work and the Northwestern on private contracts. She made monthly reports to Bowers of the work done by the former, and made payments of royalty down to November at the reduced rate, but made no reports or payments in respect of the work of the Northwestern.

In the latter part of November, 1901, a controversy arose between Bowers and Mrs. Barker as to whether the dredge Northwestern came under the supplemental contract of June 18, 1900, and its operation, therefore, became the subject of royalty, and, if not, then whether the estate should pay royalty of one cent per yard of the work done by the Superior, which was the rate prior to the reduction agreed upon in view of the employment of a second dredge. This controversy was settled by the payment of a lump sum materially in excess of the royalty due for the work of the West Superior on the half-cent basis, but the settlement receipt did not show which theory was adopted.

In April, 1902, Mrs. Barker sold to the defendant dredging company the entire dredging business and property, including the dredges West Superior and Northwestern. The bill of sale contained this clause: "This instrument is intended to include and convey all patent rights and all licenses to practice or enjoy patents and patented inventions appertaining to the dredging business owned or controlled by first party." The first party in this bill of sale was Mrs. Barker, the executrix. At the consummation of the sale there were turned over to the defendant dredging company the original Bowers license covering the Northwestern and also the license to Barker covering the West Superior. Thereafter the defendant operated the latter on the government contract and on private work, and also operated the Northwestern exclusively on private work, but it made no reports of work done and no payments of royalty. Bowers' action was brought to recover royalty claimed to be due on account of the work done by both dredges.

John H. Miller (H. G. Gearhart, on the brief), for plaintiff in error.
Thomas J. Davis (Theodore Hollister, on the brief), for defendant in error.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

HOOK, Circuit Judge, after stating the case as above, delivered the opinion of the court.

The assignment of error relied on is that the trial court erred in directing a verdict for the defendant. The action of Bowers for royalty is founded upon the assertion of the existence between him and the defendant dredging company of the relation of licensor and licensee of his patented inventions. It is claimed that such relation is deducible from the original nonassignable license to Barker, the amendment thereof by the insertion of the words "heirs, representatives and assigns," the supplemental contract authorizing the use of a second dredge and the reduction of the agreed royalty rate, the death of Barker, the passing of the license to his wife as executrix, her sale of the dredges and all appertaining licenses to the defendant, and its acceptance thereof and continued use of the dredging machines.

It is also claimed that, even though there was no amendment of the license to Barker during his lifetime, it was in fact treated as assignable by both Bowers and Mrs. Barker, the executrix, and that if the nonassignable character of a license is once waived as to one assignee it is by force thereof waived as to all succeeding ones, and the license thereupon takes its place among those that may be transferred by the act of the holder or by operation of law at his death. It is further claimed that, aside from the foregoing, when the defendant accepted from Mrs. Barker as executrix the bill of sale of the dredges

and licenses pertaining thereto and received into its possession the Barker license, and without repudiating it continued the operation of the dredges, it cannot be heard to say that it was acting adversely to the plaintiff or that its position was antagonistic to the validity of his patent rights.

First as to the original license and the question whether it was amended in respect of its nonassignability during Barker's lifetime. A license to use a patented invention that does not contain words importing assignability is a grant of a mere personal right to the licensee which does not pass to his heirs or representatives and which cannot be transferred to another without the expressed consent of the licensor. Hapgood v. Hewitt, 119 U. S. 227, 234, 7 Sup. Ct. 193, 30 L. Ed. 369; Oliver v. Rumford Chemical Works, 109 U. S. 75, 82, 3 Sup. Ct. 61, 27 L. Ed. 862; Troy Iron & Nail Factory v. Corning, 14 How. (U. S.) 193, 216, 14 L. Ed. 383.

Both parties to this controversy agree that, tested by this well-established rule, the license from Bowers to Barker was not assignable while in its original form, unchanged by agreement. But Bowers claims that there was evidence sufficient to require submission to the jury of an agreement between him and Barker that words importing assignability should be inserted at the appropriate place in the contract. The evidence upon the subject was substantially as follows: Shortly after the execution of the license Barker, who was in Wisconsin, wrote to Bowers, who lived in California, requesting that four specified changes be made, and that a new contract of license be drawn embodying them, and be also signed by another party who was supposed to have an interest in the patents. Bowers replied, denying that any one else had any substantial interest, declining to make two of the changes, consenting to one in a modified form, and agreeing to the remaining one making the license assignable by the insertion of the words "heirs, representatives and assigns." He did not adopt Barker's suggestion that a new contract be prepared. He called Barker's attention to the fact that some installments of royalty were past due and unpaid, and said that he should expect interest thereon at the rate of 7 per cent. per annum. He concluded his letter as follows:

"Please send me drafts for these sums with said interest. The aforesaid changes in the license are to be made and become effective only on receipt of said draft by me."

The evidence leaves it uncertain whether Barker paid the past-due royalty by draft as requested or by promissory note. If it were important whether he paid by draft instead of by note, it should be said that there was a sufficient conflict in the evidence to require a submission to the jury. But, whatever the fact in this particular may have been, it was admitted by Bowers that Barker did not pay either by draft or by note the accrued interest upon the past-due installments of royalty. Bowers testified that he waived the interest, but there is no evidence in the record that such waiver was ever communicated to Barker. A waiver of the condition in whole or in part should have been brought to the attention of Barker. So far as the record shows, Barker's conduct was entirely consistent with the position that he did not think it worth while to accept the changes that Bowers was willing

to concede. What he subsequently paid, whether by draft or by note, was no more than he owed and should have paid had nothing whatever been said about the amendment of the license. About seven months later Bowers and Barker met in Wisconsin and agreed upon the supplemental contract of June 18, 1900, but it contains no recognition of any prior changes in the original license, nor does it appear from the record that any discussion of the matter occurred between them.

As in the making of a contract so in the amendment of one there should be a meeting of the minds of the parties. Consent by one party to an amendment upon a specified condition to be precedently performed by the other must be followed by performance, unless the condition is waived by him who imposed it and the fact of waiver made known to the other. The condition is to be considered as rejected if, without knowledge of the waiver, there is failure to perform it. It is quite clear from Bowers' subsequent conduct that he regarded the license as having been made assignable. Since the license by its terms ran during the life of the patents, an assignable quality would have been of such benefit to Barker that slight evidence would have been sufficient to show his acceptance of an offer of it, but an acceptance cannot be inferred merely because it would have been beneficial. There is nothing in the evidence showing that Barker was aware of the waiver by Bowers of the condition, and nothing in his acts indicating that he regarded the provisions of the original license as having been changed. The trial court was, therefore, right in holding as it did that upon the evidence adduced Bowers and Barker did not come to an agreement upon the proposed amendment. But it is also clear that after Barker's death both Bowers and the executrix regarded the license as having passed to the latter. She continued the operation of the dredge West Superior, which was the subject thereof, without seeking or procuring from Bowers any new or additional authority, nor did Bowers himself consider that any act of his was necessary to confer upon her the lawful right to proceed in the same manner and under the same conditions as existed prior to her husband's death. She continued to make reports of work done by the dredge West Superior, and to make payments of royalty at the half-cent rate which her husband had been paying for the greater part of the preceding season. And when the controversy over the work of the emancipated dredge Northwestern, whether it should be considered as the second dredge under the contract of June 18, 1900, and, if not, whether she should pay the one-cent rate for the work of the West Superior, was settled by the payment of a less sum than was due upon either theory, Bowers and the executrix expressly agreed that the amount of royalty to be paid in the future should be determined by the contracts, letters, arrangements, and agreements as they existed prior to the death of Barker. This was evidently for the purpose of rebutting any presumption that a new arrangement was entered into with the executrix differing from that which theretofore existed, and it was consistent with a recognition that the license with its various conditions and modifications became at the death of Barker an asset of his estate. There was no evidence of the granting of a new license to the executrix. The

conduct of the parties showed that they considered the old one to have passed by operation of law, a species of assignment, to the estate of the original holder.

It is true, as contended by defendant, that a license may be created by parol and be established by clear implication from proven facts and circumstances (Solomons v. United States, 137 U. S. 342, 11 Sup. Ct. 88, 34 L. Ed. 667; McClurg v. Kingsland, 1 How. [U. S.] 202. 205, 11 L. Ed. 102; Anderson v. Eiler, 1 C. C. A. 659, 50 Fed. 775; Withington-Cooley Mfg. Co. v. Kinney, 15 C. C. A. 531, 68 Fed. 500), but it is also true that by like implication arising from facts and circumstances and the conduct of the parties a continuing assignable quality may be given to a license originally unassignable. That the proof thereof rests in parol is not material where no one is concerned except the parties and their privies. Whatever Barker's position may have been, both Bowers and the executrix regarded the license as having passed to the latter by operation of law, and not as being held by her by reason of any new contract to that end. While this condition subsisted the executrix sold and gave to the defendant a bill of sale of the entire dredging plant, business, and dredging contracts, including the dredges Northwestern and West Superior and "all licenses to practice or enjoy patented inventions," and as part of the transaction turned over to defendant the Barker license affecting the West Superior and also the license papers connected with the Northwestern. The defendant accepted the bill of sale so worded and received and retained possession of the Barker license, and thereafter, without repudiating the license before this controversy arose, it continued the use and operation of the dredge to which it related. Bowers acquiesced in this last transfer. His attitude is indicated by his demand for royalty. After the death of Barker and until this controversy arose all parties treated the license as being assignable. That the defendant did so is shown by its knowledge that the executrix had been operating under the license, and that she asserted a right to transfer it and made manual delivery thereof, and by the fact that it accepted the license, and continued the use of the dredge with its patented appliances without disavowal of responsibility. It should not be allowed to occupy a position in which, if sued in tort for an infringement, it could interpose in defense the contract of license, and, if sued for royalty under the license, it could then deny any contract relation, and insist that its acts were in hostility to the validity of the patents. We are of the opinion that under the evidence the defendant should have been held as a licensee.

As the case must be again tried, it will be helpful to express our opinion upon the measure of recovery—whether royalty should be computed upon the work of both dredges or be confined to that of the West Superior, and, if the latter, then at what rate.

The supplemental contract of June 18, 1900, between Bowers and Barker did not impose upon the latter an obligation to procure and operate a second dredge. It merely gave him the option to do so, and, if exercised, applied a reduced rate to the excavations of both dredges. At this time Barker contemplated the construction of another dredge, but he seems to have abandoned the project. He pur-

chased the Northwestern, which, though licensed by Bowers, was emancipated from the future payment of royalty. Moreover, this dredge had scarcely half of the capacity required by Bowers in the option to Barker. What Barker's purpose was does not appear because he died before the Northwestern was put to work the ensuing season. Apart from the provisions of the contract of June 18th, it could have been operated without liability of any kind to Bowers. When the executrix operated both the Northwestern and the West Superior after her husband's death she availed herself of the reduction of the one-cent rate upon the government work done by the latter dredge to the half-cent rate which was to prevail upon compliance with the option. Her husband had been paying this same reduced rate during the greater part of the preceding season. Were this all, it might be inferred that it was the intention that the Northwestern should perform the part of the second dredge, and that its emancipation from royalty was waived for the time being. But, on the other hand, the executrix made no reports of the work of the Northwestern, and made no payments on account thereof before the controversy arose at the end of the season of 1901. Near the beginning of the following season she made the sale to the defendant. The settlement of the controversy did not indicate what theory was adopted, but it fairly appears that the executrix through her counsel persisted in claiming the continued exemption of the Northwestern from the payment of royalty. Considering the acts of the parties, the marked difference in capacity of the Northwestern from that of the second dredge required by Bowers, and the fact that it had been emancipated and was the subject of unrestricted use, we are of the opinion that the terms of the option had not been complied with, that the Northwestern remained a free dredge, and that recovery should be limited to royalty upon the operation of the West Superior. As there was no reduction by the employment of a second dredge, the rates for government and private contract work obviously remained as originally fixed in the license.

The judgment is reversed, and the cause is remanded for a new trial.