**In re CFLC, INC., a Delaware corporation, formerly known as Everex Systems, Inc., a Delaware corporation, Debtor.**

**Nos. C–94–1079 CW, C–94–1279 CW.**

United States District Court, N.D. California.

Oct. 4, 1994.

---

John Walshe Murray, Patrick M. Costello, Mark A. Wayne, Murray & Murray, Palo Alto, CA, for appellant in docket No. C–94–1079 CW.

William P. Weintraub, Daniel L. Egan, Richard M. Adler, Murphy Weir & Butler, San Francisco, CA, for appellant in docket No. C–94–1279 CW.

George C. Webster, II and K. John Shaffer, Stutman Treister & Glatt, Los Angeles, CA, for Cadtrak Corporation.

## OPINION AND ORDER AFFIRMING ORDER OF BANKRUPTCY COURT

WILKEN, District Judge.

### I.

### INTRODUCTION

This matter came on regularly for hearing on September 2, 1994 before the United States District Court for the Northern District of California, the Honorable Claudia Wilken presiding, on the consolidated appeal of Appellant CFLC, Inc. and Appellant Everex Systems, Inc. This Court took the matter under submission. Based upon the written submissions and oral arguments of all counsel, the Court now affirms the orders of the bankruptcy court.

### II.

### JURISDICTION AND STANDARD OF REVIEW

The district court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a). The bankruptcy court's conclusions of law are reviewed *de novo* and its findings of fact under the clearly erroneous standard. Fed. R.Bankr. 8013; *In re Wegner,* 839 F.2d 533, 536 (9th Cir.1988).

### III.

### STATEMENT OF FACTS AND PROCEDURAL HISTORY

In 1986, Appellant CFLC Inc. ("CFLC") entered into a patent license agreement with Appellee Cadtrak Corporation ("Cadtrak"). For a one time payment of $290,000.00 by CFLC, Cadtrak granted CFLC, and any company more than 50% owned by CFLC, a royalty-free, non-exclusive license to certain intellectual property protected by a patent. By its terms, the license is non-transferable and can be terminated by Cadtrak upon CFLC's bankruptcy. The license recites that it shall be construed in accordance with the laws of the state of California.

On January 4, 1993, CFLC commenced a Chapter 11 proceeding. It sold certain divisions, subsidiaries and property for approximately twenty million dollars. It thereafter sought and obtained bankruptcy court approval to sell "substantially all" of its remaining assets for approximately $5 million to Yside Corporation, including its remaining operating assets, certain intangible assets such as name and goodwill, and certain contract rights. Yside Corporation has since taken the name of Everex Systems Inc. ("Everex") and is the second Appellant in this matter. Under the terms of the sales agreement, CFLC was required to assign to Everex executory contracts designated by Everex. The sale closed on November 12, 1993.

On January 4, 1994, CFLC filed a motion in its Chapter 11 proceeding to assume executory contracts, including the Cadtrak license, and assign them to Everex. Cadtrak opposed the assignment. CFLC's motion was granted as to all contracts except the Cadtrak license. The bankruptcy court, Judge Randall J. Newsome presiding, held that the Cadtrak license was not assignable without the consent of Cadtrak. From that ruling, CFLC and Everex now appeal.

### IV.

### DISCUSSION

■ The Bankruptcy Code generally authorizes a trustee to assume and assign executory contracts of the debtor. 11 U.S.C.

§ 365. Subsection 365(f)(1) allows executory contracts to be assigned notwithstanding a provision in the contract which prohibits or restricts such assignments, except as otherwise provided in subsection 365(c). Subsection 365(c)(1) prohibits assignment over the objection of the other party to the contract when "applicable law excuses" the other party "from accepting performance from or rendering performance to an entity other than the debtor." This language is interpreted as prohibiting the trustee from assigning over objection a contract of the sort that applicable law makes nonassignable when the contract itself is silent about assignment. *Matter of Midway Airlines Inc.*, 6 F.3d 492, 495 (7th Cir.1993); *In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 29 (1st Cir.1984). Thus, subsection 365(f) operates to delete a nonassignability clause from a contract and render it "silent" regarding assignment, but subsection 365(c) restores the nonassignability if applicable law holds such "silent" contracts to be nonassignable.

The instant patent license contract provides that it shall be interpreted according to the laws of the state of California. However, the bankruptcy court held that the federal law regarding the assignability of patent licenses preempts the state law and must be applied. Thus the major issue on appeal is which law is "applicable" within the meaning of subsection 365(c). This issue cannot usefully be separated, however, from the content of the conflicting federal and state law.

The venerable federal doctrine applied by the bankruptcy court dates back to the nineteenth century, thus pre-dating *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1942). The United States Supreme Court held several times in that century that nonexclusive patent licenses may not be assigned absent the patent holder's express consent. The leading case is *Hapgood v. Hewitt*, 119 U.S. 226, 233, 7 S.Ct. 193, 197, 30 L.Ed. 369 (1886) (citing earlier cases with similar holdings). Little reasoning was articulated in these cases; rather the Court seemed to assume that the point needed no explanation. The Court has never contradicted itself on this point, and the circuits

have uniformly followed *Hapgood*, even after *Erie.*

In 1957, the California Supreme Court decided that, in light of the rule of *Erie* that there is no general federal common law, federal law should no longer apply to the issue of assignability of patent licenses, and further held that under California law, patent licenses could be freely assigned. *Farmland Irrigation Co., Inc. v. Dopplmaier*, 48 Cal.2d 208, 308 P.2d 732 (1957). Justice Traynor's opinion distinguished between assignability of the patent itself, which is clearly controlled by federal statute, 35 U.S.C. § 261, and assignability of rights arising from a patent license exempting the licensee from the patent monopoly. *Id.* at 216, 308 P.2d 732. Justice Traynor pointed out that actions to set aside or enforce a patent license are governed by state law and federal courts do not have federal question jurisdiction over such actions. *Id.* at 217, 308 P.2d 732.

Justice Traynor recognized, however, that even if patent license contract issues are generally governed by state law, the issue of assignability of the license would not be, "if the policy of the patent laws or some other federal statute requires" that the state law give way. *Id.* at 219, 308 P.2d 732. He further recognized that the absence of an applicable statutory provision did not in itself mean that federal law does not control, for "if the policy of the federal statute or the implications of the federal system require a uniform rule of decision, the federal courts have paramount power to fashion such a rule." *Id.*

Justice Traynor then examined the old Supreme Court cases and found that they involved no conscious choice between state and federal law. *Id.* He also found no indication of a policy underlying the federal patent statutes that requires a uniform federal rule, stating:

"The purpose in granting a patent monopoly is to promote progress in science and the useful arts by stimulating invention and encouraging disclosure. So long as state law does not destroy the advantages of the monopoly, it respects the federal

purpose, and there is no reason why it should not govern ..."

*Id.* at 220, 308 P.2d 732.

Recent circuit court cases have followed the traditional federal rule of nonassignability of non-exclusive patent licenses absent express consent of the patent holder, and in the process have elucidated the federal policy implicated. The leading case is *Unarco Indus., Inc. v. Kelley Co.,* 465 F.2d 1303 (7th Cir.1972), *cert. denied* 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 590 (1973). In *Unarco,* the Seventh Circuit expressly considered whether assignability of a patent license should be decided under state or federal law in light of *Erie.*

In deciding that federal law applies, the *Unarco* court relied on the exception to the *Erie* doctrine explained in *Sola Electric Co. v. Jefferson Electric Co.,* 317 U.S. 173, 176, 63 S.Ct. 172, 174, 87 L.Ed. 165 (1942):

> [T]he doctrine of [*Erie* ] is inapplicable to those areas of judicial decision within which the policy of the law is so dominated by the sweep of federal statutes that legal relations which they affect must be deemed governed by federal law having its source in those statutes, rather than by local law. (citations omitted) To the federal statute and policy, conflicting state law and policy must yield.

*Id.* at 1305, quoting *Sola,* 317 U.S. at 176, 63 S.Ct. at 174. In *Sola,* the controlling federal policy was that of the Sherman Act. The *Unarco* court held that the patent laws equally dominated the area of patent license assignability.

The *Unarco* court pointed out that the patent laws derive from Congress' explicit constitutional authority "to promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Constitution, Art. I, Section 8, Clause 8. Congress has implemented this "exclusive and personal" concept of patents through its patent legislation. *Unarco,* 465 F.2d at 1306. Patent licenses are intimately related to the monopoly conferred by the patent statutes:

> When an inventor or person holding patent rights desires to license or relinquish any part of the patent monopoly, such person is utilizing the monopoly of rights intended by the framers of the Constitution and the legislation of Congress to reward invention and originality. This monopoly conferred by federal statute as well as the policy perpetuating this monopoly, so affects the licensing of patents, and the policy behind such licensing is so intertwined with the sweep of federal statutes, that any question with respect thereto must be governed by federal law.

*Id.* Therefore, the *Unarco* court applied "the long standing federal rule" that patent license agreements "are personal to the licensee and not assignable unless expressly made so in the agreement." *Id.*

The Sixth Circuit Court of Appeals followed *Unarco* to hold that federal law applies to the assignability of a patent license. *PPG Industries, Inc. v. Guardian Industries Corp.,* 597 F.2d 1090 (6th Cir.), *cert. denied* 444 U.S. 930, 100 S.Ct. 272, 62 L.Ed.2d 187 (1979). No circuit court has held otherwise.

The Ninth Circuit has not had occasion to visit this issue. However, in deciding on transferability of a copyright license, the Ninth Circuit analogized to patent law and applied the federal nonassignability rule, expressly relying on *Hapgood* and *Unarco. Harris v. Emus Records Corp.,* 734 F.2d 1329, 1733 (9th Cir.1984).

The only case cited by either party which addresses the issue of assignability of patent licenses in the context of applying 11 U.S.C. § 365 is *In re Alltech Plastics, Inc.,* 71 B.R. 686 (W.D.Tenn.1987). The court there applied federal patent law as the "applicable law" within the meaning of subsection 365(c). It applied the federal nonassignability rule of *Unarco* and held that the trustee did not have the power to assign the patent license absent consent from the licensor.

■ Appellants ask this Court to disregard the federal law and follow the reasoning of Justice Traynor in *Dopplmaier.* This Court cannot do so; it is bound by the federal authority. Furthermore, the persuasiveness of *Dopplmaier* is undercut by the more

recent federal case law, inasmuch as *Dopplmaier* relied upon the failure of the federal courts to consider expressly whether a federal rule was needed. The federal courts have now done so, and have found that federal law must control.

Appellants argue that doubt is cast on the federal rule by *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 99 S.Ct. 1096, 59 L.Ed.2d 296 (1979). In *Aronson,* an inventor negotiated a royalty-based contract with a manufacturer which provided that the amount of royalty was to be reduced if the inventor failed to secure a patent within five years. The inventor applied for a patent, and her application was denied. The manufacturer commenced an action for a declaratory judgment that the royalty agreement was unenforceable as being in conflict with the federal patent laws.

The Supreme Court held that the agreement was not inconsistent with, and therefore not preempted by, the patent laws. The agreement specifically contemplated that the pending patent application might be denied, and the lower royalty rate was "explicitly independent of federal law." *Id.* at 261–62, 99 S.Ct. at 1098–99. Furthermore, no patent had issued, and no idea had been withdrawn from the public domain. Since no patent was involved, cases and principles relating to contracts that had patents as their subject matter were inapplicable. *Id.*

Thus the *Aronson* case is inapplicable to the instant case, which does involve a patent. Furthermore, *Aronson* is not inconsistent with the ruling of the bankruptcy court in this case. The *Aronson* Court expressly considered federal patent policy before determining that the state contract laws would not be preempted thereby. It found that permitting inventors to make enforceable royalty agreements was not inconsistent with any of the policies of the patent system. *Id.* at 262, 99 S.Ct. at 1099. Permitting inventors to collect royalties is consistent with the primary policy of patent law to foster and reward invention. *Id.* Enforcing royalty agreements encourages inventors to have their inventions manufactured and offered to the public, which is consistent with the policy of promoting disclosure of inventions. *Id.* at 262–63, 99 S.Ct. at 1099–1100. Finally, enforcement of the royalty agreement did not withdraw any idea from the public domain, and was therefore consistent with the policy to assure that ideas in the public domain remain there. *Id.* The manufacturer had bargained to be able to exploit the idea before it entered the public domain, in return for which it would continue to pay royalties after it did enter the public domain. Such a bargain is no more inconsistent with patent policies than any other costs involved in being the first to introduce a new product to the market. *Id.*

Applying the patent law policies identified in *Aronson* to the California law of patent license assignability reveals that a basis for preemption does exist. The policy to "foster and reward invention" is primarily accomplished by granting a 17 year monopoly for the patent holder to exploit. Limiting assignability to licenses in which the patent holder expressly agrees to assignment aids the patent holder in exploiting the patent and thus "rewards" the patent holder. Free assignability of a non-exclusive patent license without the consent of the patent holder is inconsistent with patent monopoly and thus inconsistent with the federal policy.

For example, a patent holder might sell a royalty-free license to a small company which it deemed to be no threat as a competitor. If the buyer then assigned the license to a large company which is a serious competitor, the patent holder's monopolistic control would be destroyed. Appellants argue that such matters could be considered on a case by case basis. However, the federal rule instead conclusively presumes harm to monopolistic control by any assignment not expressly consented to by the patent holder, and this rule fairly carries out the policy of the patent laws. It is not for this Court to disregard that federal rule, and *Aronson* is no authority for doing so.

Appellants argue that bankruptcy policy requires maximization of a debtor's assets and that the result reached here by the bankruptcy court undermines that policy. This is indeed the policy effectuated by 11 U.S.C. § 365(f). However, § 365(c) recognizes that there are other policies in law as

well, and the statute expressly subordinates the policy of maximization to those other policies.

Appellants also argue that the "establishment of a rule of *per se* nonassignability" will jeopardize the reorganization of all technology-based debtors. However, the application of this longstanding federal rule does not impose *per se* nonassignability; there is nothing in the federal rule to prevent patent holders from conferring assignable licenses to companies willing to pay the additional cost of such licenses.

Appellants finally argue that even if federal law applies, the Court should apply the exception to the federal rule of nonassignability, that a nonassignable patent license may pass to a "successor" of the licensee. This doctrine arises from the venerable case of *Lane & Bodley Co. v. Locke,* 150 U.S. 193, 197, 14 S.Ct. 78, 79, 37 L.Ed. 1049 (1893), in which the Supreme Court held that an implied patent license known as a "shop right" may pass from a licensee partnership to a corporation formed "to carry on the same business and in the same interest" where the patent holder acquiesces in the use of the shop right by the successor.

The Ninth Circuit has applied this doctrine in *California Eastern Laboratories, Inc. v. Gould,* 896 F.2d 400 (9th Cir.1990). In *CEL,* the inventor began working under contract to one business, then entered into a contract with CEL to do further work on the invention to ready it for market. Shortly thereafter, CEL purchased the first business and all of its assets. The Ninth Circuit affirmed the finding that shop rights held by the first business passed to CEL when it purchased "the entire business and assets." The Ninth Circuit did not expressly rely, as had the Supreme Court in *Lane & Bodley Co.,* on the acquiescence of the inventor, but the facts regarding acquiescence were similar in the two cases.

*Lane & Bodley* and *CEL* are inapposite to the instant case. This case does not involve an implied license, but an actual license agreement negotiated at arms length. The *Lane & Bodley* Court expressly relied on a distinction between the two types of license. 150 U.S. at 196, 14 S.Ct. at 79. Further-

more, this case does not involve, as did *Lane & Bodley,* a mere change in the form of the company, nor, as in *CEL,* the sale of the *entire* business; rather, at most, this case involves the sale of "substantially all" of the assets of the "core business." Finally, in the instant case the patent holder does not acquiesce in the acquisition of the license. Appellants provide no authority for extending the narrow exception of *Lane & Bodley* and *CEL* to these circumstances.

V.

CONCLUSION

Appellants have failed to demonstrate that the bankruptcy court erred in any way. The bankruptcy court properly applied a long-standing rule of federal law. Accordingly, the order of the bankruptcy court is hereby affirmed.

IT IS SO ORDERED.