**VERSON CORPORATION, a Delaware corporation, Plaintiff,**

v.

**VERSON INTERNATIONAL GROUP PLC, an English corporation, Verson Wilkins Limited, an English corporation, and Verson International Limited, an English corporation, Defendants.**

No. 93 CV 2996.

United States District Court,
N.D. Illinois,
Eastern Division.

July 17, 1995.

Gordon Nash, Jr., Michael P. Padden, and Gail J. Berritt, Gardner, Carton & Douglas, Chicago, Illinois, for plaintiff.

Thomas Johnston and Catherine A.T. Nelson, Keck, Mahin & Cate, Chicago, Illinois, for defendants.

### MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Plaintiff Verson Corporation brought this lawsuit alleging that defendants Verson International Group, Verson Wilkins Limited, and Verson International Limited violated a license agreement for intellectual property. Before us now is defendants' motion to dismiss plaintiff's amended complaint. For the reasons set forth below, the motion is denied.

## BACKGROUND

Verson Corporation (Verson), the successor to Verson Allsteel Press Company (VASP) and the wholly-owned subsidiary of Allied Products Corporation, manufactures presses for the metal-forming industry. In the early 1980s VASP began experiencing financial difficulties. In order to ease through its financial downturn VASP and a group of its international managers entered into an agreement wherein the managers would buy out VASP's international operations with a newly formed independent company, Verson International Limited (collectively referred to herein, along with Verson Wilkins Limited and Verson International Limited, as "VIL"). VIL and VASP entered into a series of agreements to facilitate the management buyout (MBO), the most important for our purposes being the VASP/VIL License Agreement (license agreement). In that agreement VASP agreed to turn over to VIL its patents and non-patented trade secrets, and allowed VIL to use this know-how. The license agreement called for both parties to turn over all newly developed know-how to the other for a period of five years. The parties also agreed to a series of restrictive covenants that gave VASP the exclusive right to market its products in the United States and Canada and gave VIL the exclusive right to market its products in the rest of the world. Both territorial restrictions were to last five years.

In the first lawsuit between the parties VIL sued VASP alleging that VASP[1] had violated the license agreement's restrictive covenants and seeking an injunction requiring Verson to turn over certain know-how. VASP argued that the territorial and durational restrictions violated state and federal antitrust laws. We enforced the restrictions only in part, finding that VIL was barred only from the use of VASP know-how in the United States and Canada, and that VASP was barred only from marketing its products in Europe. *Verson Wilkins Ltd. v. Allied Products Corp.*, 723 F.Supp. 1, 20 (N.D.Ill.

1989). We also required VASP to turn over the know-how covered under the license agreement. In 1990 the parties executed a settlement agreement disposing of the remaining disputes regarding exchange of the know-how.

Soon thereafter VIL entered into an agreement with Enprotech Mechanical Services, Inc. (Enprotech), a direct competitor of Verson in the North American market. In this agreement VIL turned over know-how it received from VASP in the 1985 license agreement and granted Enprotech the exclusive right to use this know-how to manufacture replacement parts for Verson presses.[2] This arrangement spawned the present lawsuit. In its complaint Verson alleged that VIL violated Article 16 of the 1985 license agreement which required VIL to obtain VASP's approval before licensing the know-how to another party, by turning over VASP know-how to Enprotech. Defendants moved to dismiss the complaint, claiming that Article 16 did not survive the termination of the agreement. We granted that motion on December 30, 1994. Verson moved for reconsideration of our order and for leave to amend its complaint, arguing that the Enprotech agreement, which Verson claims is an assignment, violated the license agreement's restriction on VIL's right to assign the know-how. Although this constituted a new line of attack for Verson, we allowed it to amend its complaint to more fully make out this claim. Verson has since amended its complaint to incorporate the assignment argument. Before us now is VIL's motion to dismiss the amended complaint. VIL argues that the 1990 settlement agreement prevents Verson from maintaining this action; that it is the co-owner of the know-how, not a licensee, and thus had the right to assign it to Enprotech; that the right to assign the know-how was implicit in the 1985 licensing agreement; that a perpetual ban on assignability would be an unreasonable restraint of trade; and that its transaction with Enprotech is a sub-

---

**1.** Actually, Allied had taken over VASP in 1986 and therefore was the named defendant in the first action. However, this distinction is immaterial for this brief recitation of the background.

**2.** The parties dispute whether VIL assigned this know-how to Enprotech or merely licensed it. That argument will be addressed *infra*.

lease rather than an assignment. We will examine each of these arguments in turn.[3]

## DISCUSSION

### A. *The 1990 Settlement Agreement*

■ VIL argues that a settlement agreement executed in connection with the earlier case involving these parties bars Verson's action here. In the first lawsuit VIL obtained an injunction requiring Verson to turn over various types of know-how related to the licensing agreement. The case was still pending, however, because the parties disputed what documents needed to be produced and who was to pay for the copying. The parties entered into a settlement in which VIL accepted some of the disputed know-how in complete satisfaction of any claim for know-how it might have had under the licensing agreement, and Verson agreed not to challenge VIL's right to use this know-how.[4] VIL argues that this action challenging VIL's assignment (or sublease) of the know-how to Enprotech is a restriction on the use of the know-how and thus violates the settlement agreement. Verson responds that VIL's right to assign or transfer the know-how remained as it was under the licensing agreement.

■ We agree with Verson that the 1990 settlement agreement does not prevent it from attempting to restrict VIL's right to assign the know-how. In settlements, as in all contracts, every effort should be made to give force to the words employed by the parties and to not imply words that the parties could have used but did not. *Harris Bank Naperville v. Morse Shoe, Inc.,* 716

F.Supp. 1109, 1122 (N.D.Ill.1989). Through the settlement Verson agreed only not to restrict VIL's use of the know-how. The word "use" does not ordinarily also include sale, transfer, or assignment. This is especially so when dealing with the right to use intellectual property. One can use know-how, trade secrets, or patents freely, but still not transfer or assign that information. The right to the know-how at issue here could easily be separated into the right to use the know-how and the right to sell, transfer, or assign the know-how, and the parties' selection of the word "use" provides support for the view that they did not intend for the settlement agreement to grant VIL a right to assign the know-how that was not already granted under the terms of the license agreement. The parties could have added "transfer or assign" to "use," and the fact that they did not is probative of the issue.

Other sections of the settlement also provide some support for that view. Under a section entitled "Reservation of Rights," both parties reserved the right to sue each other for any breach of the licensing agreement. The fact that both parties sought to preserve their rights under the licensing agreement arguably indicates that the settlement was intended only to resolve the dispute as to what know-how Verson was required to turn over and who was to pay for the copying costs. VIL's reading of the reservation-of-rights clause, that the parties intended only to prevent public disclosure of the know-how, is strained, given that the parties could have easily drafted the clause to reflect that intent but did not. Therefore, we hold that the 1990 settlement agreement was not an unambiguous waiver of Verson's right to challenge

---

**3.** Verson claims that VIL's arguments are merely "rehashed" from its memorandum in opposition to Verson's motion for reconsideration and to amend its complaint, and that we rejected these arguments in granting Verson leave to amend its complaint. However, in allowing Verson to amend its complaint we did not rule on any of the arguments VIL advances here. Rather, our opinion focused exclusively on whether we should allow Verson to amend its complaint to present a different theory of recovery, and we concluded that Verson should have a second chance to present a cognizable claim. Verson

has attempted to do so and VIL is now free to attack the complaint.

**4.** Specifically, the settlement agreement stated: Allied agrees not to seek the return or to restrict the use of any know-how which it or its predecessor has transmitted to VIL, or which may be transmitted to VIL under this Settlement (collectively, the "Transmitted Know–How"). Allied hereby waives all claims and defenses relating to VIL's entitlement to the possession or use of the Transmitted Know–How.

VIL's assignment of the know-how.[5]

## B. *Is VIL a Co–Owner of the Know–How Or Only a Licensee?*

■ The premise behind Verson's complaint is that VIL is a non-exclusive licensee of the know-how. In earlier orders we expressed some doubt regarding this proposition and left open the question whether VIL is a co-owner of the know-how. *See Verson Corp. v. Verson International Group,* No. 93 C 2996, 1994 WL 376278 at *3 (N.D.Ill. July 13, 1994). VIL seizes upon this language and presses the argument here.

The starting place for determining whether VIL is a co-owner of the know-how is the 1985 license agreement. The agreement states that "[u]pon expiration of the term of this Agreement, subject to [confidentiality provisions], Licensee shall have the non-exclusive perpetual royalty free right to continue to exercise, use or practice the rights granted Licensee under Section 2.01 without limitation as to Territory . . . ." As we indicated above, the use of know-how can be readily distinguished from the ownership of the know-how. Thus, one meaning of the license agreement grants VIL only the right to use the know-how to compete with Verson worldwide. The language of this provision, or the other provisions in the agreement, do not necessarily indicate the parties intended for VIL to become co-owner of the know-how at the termination of the five-year period.

Despite the lack of any express provision in the license agreement granting it co-ownership of the know-how, VIL presents four arguments to support its claim: first, that the amount it paid in connection with the MBO indicates that VIL would become co-owner of the know-how; second, that it developed some of the know-how itself; third, that the clear intent of the MBO and license agreement was to make VIL and Verson head-to-head competitors after five years; and, fourth, that VIL acquired property rights to the know-how when it acquired VASP's international operations.

We find that none of these four arguments helps VIL's cause here, even if we can entertain them in support of a motion to dismiss. First, the amount VIL paid in connection with the MBO does not by itself demonstrate anything about the parties' intent. The license agreement was just one part of a series of agreements executed in connection with the MBO. It is impossible to say as a matter of law that the consideration paid by VIL was to acquire ownership rights to the know-how after five years. VIL may be able to present evidence that the true value of what it received in the MBO could not come near the $8 million it actually paid if ownership of the know-how were not included, and in such a situation we could find the consideration paid to be probative of the parties' intent. However, we cannot make that determination on a motion to dismiss.

Second, Verson disputes VIL's claim that it developed part of the know-how at issue here. It is clear that whether or not VIL did develop this know-how is a disputed question of fact that cannot be resolved on a motion to dismiss. Such a determination must await further development by the parties.

Third, we have repeatedly recognized that the goal of the MBO in general, and the license agreement in particular, was to place VIL and Verson as head-to-head competitors at the end of five years, as VIL argues. That proposition does not, however, establish VIL's ownership of the know-how. At the end of the agreement, VIL had every right to compete with Verson in any market in the world. In that respect the two firms were head-to-head competitors. Limiting VIL to the right to use, instead of assign, the know-how does not appear to frustrate this goal. All VIL is prevented from doing is assigning or selling the know-how to a competitor. This limitation has no effect on VIL's ability to compete with Verson in the manufacture, sale, or repair of presses.

Finally, it is not clear at this point what rights VIL acquired in the MBO when it took over VASP's international operations. Until now we have never been faced with deter-

---

**5.** Although VIL at one point argued that a mutual release signed by the parties in 1991 bars the action here, it has since made clear that it has abandoned that claim and instead focuses solely on the 1990 settlement.

mining exactly what rights VIL acquired in the MBO. Verson has submitted a number of the agreements involving VASP and its many subsidiaries, that purportedly demonstrate that. VIL acquired only licensing rights, not ownership rights, to the know-how. VIL has not contradicted Verson's recitation of the corporate history. Accepting Verson's allegation that no ownership rights were transferred in the MBO—an allegation supported by the submitted documents—we hold that Verson has properly alleged that VIL was a mere licensee, not a co-owner, of the know-how.

### C. *Implied Right of Assignability*

VIL does not dispute that there is no provision in the license agreement granting it an explicit post-termination right to assign the know-how. Yet it argues that despite this lack of express authority, authority to assign its rights under the agreement must be inferred from the circumstances and the parties' conduct.

■ Under well-established law the holder of a nonexclusive patent license may not assign its license unless the right to assign is expressly provided for in the license agreement. *See Stenograph Corp. v. Fulkerson,* 972 F.2d 726, 729 n. 2 (7th Cir.1992) ("Patent licenses are not assignable in the absence of express language."); *Unarco Industries Inc. v. Kelley Co.,* 465 F.2d 1303, 1306 (7th Cir. 1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 590 (1973); *Gilson v. Republic of Ireland,* 787 F.2d 655, 658 (D.C.Cir. 1986); *In re CFLC, Inc.,* 174 B.R. 119, 122 (N.D.Cal.1994). Under this longstanding federal case law, patent licenses are treated as personal to the licenseholder and therefore are presumed to be not assignable. *Id.*

■ VIL argues that his presumption against assignability may be overcome by the circumstances and the conduct of the parties. As support, VIL cites *Farmland Irrigation Co. v. Dopplmaier,* 48 Cal.2d 208, 308 P.2d 732 (1957), and *Bowers v. Lake Superior Contracting & Dredging Co.,* 149 F. 983 (8th Cir.1906). We seriously doubt whether these decisions survive the later developed line of cases refusing to imply a right of assignability of patent licenses.[6] Even if some vestige of *Farmland* and *Bowers* remains, we cannot overlook decades of precedent to the contrary. *See Unarco Industries Inc.,* 465 F.2d at 1306. Therefore, we feel bound to require compelling evidence of the parties' intent before implying a right to assign. Such evidence is not presented here, nor may it be considered to resolve a motion to dismiss.

■ VIL points to two aspects of the parties' conduct to support its claim that a right of assignment should be inferred. First, it argues that the fact that the license agreement gave it broad authority to sublicense its rights without Verson's approval establishes conclusively that the parties did not believe that the patented rights were highly personable and therefore could be assigned. We disagree. VIL seeks to bootstrap its negotiated right to sublicense into a right to assign. Were VIL correct, every license granting a right to sublicense would also implicitly contain a right of assignment. That is clearly not the case. On the contrary, under the axiom of *expressio unius,* the presence of the provision on sublicensing indicates that the parties did not intend to allow assignments. Further, VIL cannot seriously maintain that Verson did not consider the know-how to be highly personable. The license agreement contained a strict confidentiality clause and every indication from the parties' conduct since the MBO is that the know-how is vital to successful competition in the industry. Therefore, it is clear that VIL's right to sublicense does not establish as a matter of law an intent to also allow it to assign its rights.

VIL also claims that Article 16 of the licensing agreement, which required VIL to first obtain Verson's approval before assigning its rights to a competitor, demonstrates that when the parties sought to restrict the right to assign they did so expressly, and the fact that there is no provision limiting VIL's right to assign post-termination establishes

---

6. The *Farmland* decision explicitly relied on state law to answer the question presented. In that the later federal cases hold that the assignability of patent licenses is a question of federal law, *see Unarco,* 465 F.2d at 1306, VIL's reliance on *Farmland* may be misplaced.

that no such limitations were intended by the parties. In addition, VIL argues that because our order of December 30, 1993, ruled that Article 16 did not survive the termination of the licensing agreement, preventing VIL from assigning its rights post-termination would mean that it had greater leeway to assign before the termination than after, which it asserts is an absurd result.

We are not persuaded that the presence of Article 16 overcomes the strong presumption against implying a right to assign licenses for intellectual property. Article 16 and a post-termination restriction on assignment are not, as VIL suggests, in hopeless conflict. It is reasonable for Verson to have allowed VIL greater leeway to assign its rights during the five-year period of the licensing agreement because VIL was prohibited by the agreement from competing with Verson in North America. After the termination of the agreement, however, VIL could compete directly with Verson in North America, which may have prompted Verson to restrict VIL's right to assign. In any event, we need not rule that this is what the parties intended. Rather, we conclude that the license agreement does not conclusively refute Verson's claim that the know-how cannot be assigned.

### D. *Restraint of Trade*

██ VIL also argues that interpreting the agreement to require a perpetual ban on VIL's ability to assign its rights is an unreasonable restraint of trade that violates Illinois common law and Illinois and federal antitrust statutes. In doing so, it apparently seeks to advance the best argument it can in support of a concern expressed by this court and, probably, upon reflection, better left unexpressed.

VIL claims that since we have previously ruled that some of the agreement's territorial restrictions violated the antitrust laws, then, *a fortiori,* a perpetual ban on assignments does so as well.

VIL is incorrect in attempting to compare the anti-assignment issue here with the covenants not to compete that were at issue in the first lawsuit between these parties. The contract provision previously at issue divided up the worldwide market for Verson presses and prevented the contracting parties from entering various markets. Thus, by their very nature, the covenants not to compete restrained competition. We held that certain of the restrictions were overly broad and upheld the covenants only in part. Unlike the covenants not to compete, the limitation on assignments does not prevent VIL from competing in the market for Verson presses.

VIL argues, however, that by preventing the assignment of the know-how, Verson is preventing other companies from entering the market. VIL's argument proves too much. Under VIL's view, any company possessing trade secrets or know-how vital to entry into an industry must turn over that know-how or risk violating the antitrust laws. That simply cannot be true, for the very nature of a patent is a government-authorized monopoly in a certain market, and much of the law of intellectual property is designed to protect a company's innovations from competitors. VIL has failed to cite a single case finding an antitrust violation because of a patent license's restriction on the licensee's right to assign.[7] In fact, the case law indicates that restrictions in patent licenses are not per se violations of the antitrust laws. *See Atari Games Corp. v. Nintendo of America, Inc.,* 897 F.2d 1572, 1577 (Fed.Cir.1990); *USM Corp. v. SPS Technologies, Inc.,* 694 F.2d 505, 513 (7th Cir.1982), *cert. denied,* 462 U.S. 1107, 103 S.Ct. 2455, 77 L.Ed.2d 1334 (1983) ("Patent licensing agreements between competitors are sometimes struck down under antitrust laws, of course, but only upon proof of anti-competitive effect beyond that implicit in the grant of the patent"); *Moraine Products v. ICI America, Inc.,* 538 F.2d 134, 145 (7th Cir.), *cert. denied,* 429 U.S. 941, 97 S.Ct. 357, 50 L.Ed.2d 310 (1976). Verson is simply not required by law to turn over the know-how, now or in the future, and it is not an unreasonable restraint of trade for it to prevent the know-

---

7. Indeed, were VIL correct, the long-established federal rule against the implied right to assign patent licenses, *see Unarco Industries Inc.,* 465

F.2d at 1306, would open every patent holder to an antitrust lawsuit.

how from falling into a competitor's hands through some other source.

### E. *Assignment or Sublicense*

 VIL's final argument is that its agreement with Enprotech is not an assignment at all, but rather is a sublicense, and since the license agreement granted VIL the authority to sublicense its rights, Verson's suit must fail.

Verson argues that intellectual property rights can be severed and assigned separately. That is, a patentee may assign the right to use a patent for sale of a product but retain the right to use the patent for other purposes. Support for this proposition can be found in tax cases, *see Cory v. Commissioner*, 230 F.2d 941, 944 (2d Cir.), *cert. denied*, 352 U.S. 828, 77 S.Ct. 43, 1 L.Ed.2d 50 (1956), and in some of the cases dealing with who has standing to sue for patent infringement. *See Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875 (Fed.Cir.1991) (recognizing patent rights as constituting a bundle of rights). Under this view the answer depends on whether the patentee has transferred all its rights in a particular market (an assignment) or has transferred only some of those rights, retaining others for itself (a license). During the course of this litigation VIL has retreated from its earlier opposition to this principle and now seems content to argue that, even if that were the law, the Enprotech agreement still cannot be considered an assignment.[8]

Verson claims that the Enprotech agreement is an assignment rather than a sublicense because VIL transferred all the rights associated with the after-market for Verson presses. Specifically, the Enprotech agreement states:

> [VIL] (i) grants and assigns to [Enprotech] (1) the exclusive (as between Licensor and Licensee), royalty free right and license to utilize the Proprietary Rights in the Territory for the manufacture and sale of Verson Parts and for the rebuilding and modernization of Verson Presses and subject to the reserved rights of [VIL], the maintenance and repair of Verson Presses, and (2) the right and license to use the Trademark in connection with the manufacture and sale of Verson Parts and, subject to the review and consent of [VIL], which consent will not be unreasonably withheld, the maintenance, repair, rebuilding and modernization of Verson Presses and (ii) sells to Enprotech the Technical Information and Other Information subject to the terms and conditions of this Agreement.

The "territory" is defined to include certain countries in North America and Central America. "Proprietary rights" and "technical information" basically entail the Verson technology that VIL received under the licensing agreement.[9]

VIL counters that it has retained sufficient rights to the after-market to render the Enprotech agreement a sublicense rather than an assignment. It identifies five such rights: (1) the right to make replacement parts in connection with the sale of new presses; (2) the exclusive right to provide service for the enhancement retrofit of Verson presses; (3) the exclusive right to provide service work for the maintenance and repair of Verson presses; (4) a fifty-year period for the agreement; and (5) a parts supply agreement requiring Enprotech to purchase spare parts from a corporation affiliated with VIL.

We can quickly dispense with VIL's argument that rights two and three render the agreement a sublicense. Those rights do not limit the agreement's grant to Enprotech of an exclusive right to manufacture replace-

---

**8.** Although the Supreme Court in *Waterman v. Mackenzie*, 138 U.S. 252, 11 S.Ct. 334, 34 L.Ed. 923 (1981) created a three-part test to determine whether a patentee has assigned or licensed his right for the purposes of determining who may sue for patent infringement, neither party argues that the *Waterman* test should be employed here. In that the only issue addressed by *Waterman* is whether the plaintiff had standing, we agree that

rigid application of that case here would be inappropriate.

**9.** Although the parties are delineated as "Licensor" and "Licensee," and the agreement is denominated a "License," these labels are not dispositive of our inquiry here. *Waterman*, 138 U.S. at 255, 11 S.Ct. at 335. Rather, the focus should be on the substantive rights conferred by the agreement. *Id.*

ment parts; the issue of repair service does not limit Enprotech's ability to use the know-how in the replacement parts market.

Similarly, the fifty-year period does not, as a matter of law, render the agreement a sublicense. Verson has alleged that the fifty-year period far exceeds the useful life of any of the know-how, given the normal rate of change in technology in the industry, and thus the fifty-year period does not serve as any practical restraint on Enprotech's rights under the agreement. Since VIL has not demonstrated that this well-pleaded allegation is incorrect as a matter of law, we must accept it as being true for the purposes of this motion to dismiss.

Nor does the parts supply agreement, as a matter of law, render the Enprotech agreement a sublicense. Although Enprotech is required to purchase certain products from a VIL-affiliated corporation, the agreement states that Enprotech's failure to abide by the parts supply agreement does not affect its exclusive rights granted elsewhere in the agreement. Therefore, the parts supply agreement need not be read to limit Enprotech's right to the use the know-how in the parts market.

That leaves the Enprotech agreement's provision granting VIL the right to manufacture replacement parts in connection with the sale of new presses. It is too early at this juncture to determine as a matter of law that VIL's retention of this right limits Enprotech's interest to a mere sublicense rather than an assignment. VIL may be able to demonstrate that its retained right to provide replacement parts as part of contracts for the sale of new presses represents a sufficiently large portion of the replacement part market to make the Enprotech agreement a sublicense, but we are not in a position to make that determination here.[10] Since VIL has failed to demonstrate that the Enprotech agreement is a license as a matter of law, we

must deny its motion to dismiss. VIL is free to renew this argument at a later stage if it can present extrinsic evidence clarifying the ambiguity in the Enprotech agreement.

### CONCLUSION

VIL may well prevail on one or more of its arguments when the record is fully developed. Given, however, the limitations of a motion to dismiss, it cannot now prevail. For the reasons outlined above, VIL's motion to dismiss the amended complaint is denied.

---

**10.** Deciding this issue as a matter of law is even less appropriate when considering the language used in the Enprotech agreement. In the agreement VIL "assigns" to Enprotech its intellectual property and "sells" to it the know-how. This language is much more consistent with an assignment than with a transfer of a mere license. Indeed, the Federal Circuit has held that "the

term 'assignment' has a particular meaning in patent law implying formal transfer of title." *Vaupel Textilmaschinen KG*, 944 F.2d at 875. Moreover, in the agreement, VIL warrants that it has good title to the know-how and is free to assign it. Again, this provision is more consistent with an assignment than a license.