**In re ACCESS BEYOND TECHNOLO-GIES, INC., n/k/a Hayes Corporation (Hong Kong) Limited, et al., Debtors.**

Bankruptcy Nos. 98–2276(MFW) to 98–2281(MFW).

United States Bankruptcy Court, D. Delaware.

July 22, 1999.

**36**

David B. Stratton, David M. Fournier, Pepper Hamilton, LLP, Wilmington, DE, Peter D. Wolfson, Suzanne D.T. Lovett, Pryor Cashman Sherman & Flynn, LLP, New York City, for Debtors.

Teresa K.D. Currier, John Knapp, Duane Morris & Heckscher LLP, Wilmingtoin, DE, Melinda A. Marbes, Kilpatrick Stockton LLP, Atlanta, GA, for 3Com Corporation.

Mark S. Kayfman, Henry F. Sewell, Jr., Long Aldridge Norman LLP, Atlanta GA, Neil B. Glassman, Micheal L. Vild, The Bayard Firm, Wilmington, DE, for Official Committee of Unsecured Creditors.

Mark D. Collins, Richards Layton & Finger, P.A., Wilmington, DE, Jesse H. Austin, III, Paul Hastings Janofsky & Walker, Atlanta, GA, for NationsCredit Commercial Corp.

John D. McLaughlin, Office of U.S. Trustee, Philadelphia, PA.

---

### OPINION[1]

MARY F. WALRATH, Bankruptcy Judge.

## I. PROCEDURAL BACKGROUND

This matter is before the Court on the Motion of the Debtors for approval of a sale to Xircom Corporation ("Xircom") of certain assets (known as the "EZJack related assets") including the rights under a patent cross license agreement between the Debtors and Megahertz Corporation dated December 31, 1990 ("the License Agreement"). The Sale Motion is supported by the Official Committee of Unsecured Creditors ("the Committee") and the Debtors' secured lender, NationsCredit Commercial Corporation ("NationsCredit"). 3Com Corporation ("3Com"), which asserts it is the successor by merger to Megahertz, objected to the sale. For the reasons set forth below, we will deny the Motion.

## II. FACTUAL BACKGROUND

In November 1994, Hayes Microcomputer Products, Inc. ("Hayes") filed a chapter 11 case in the United States Bankruptcy Court for the Northern District of Georgia. In that first bankruptcy case, Hayes filed a plan of reorganization in which certain minority shareholders were cashed out and the debtor merged with the subsidiaries of the new investors ("the Plan"). The Plan expressly called for the assumption of the License Agreement. Megahertz objected. The Bankruptcy Court overruled the objection and entered two orders. The first order found that the License Agreement was executory and authorized its assumption as part of the Plan. The second order confirmed the Plan. Megahertz appealed both orders.

In the interim, one of the Plan investors withdrew from the Plan. Hayes filed a Motion for order in aid of confirmation which called for substituting the investor under the Plan. The Bankruptcy Court

---

1. This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

entered the order after finding it was authorized by the Plan and did not constitute a modification of the Plan. The Bankruptcy Court, however, expressly declined to rule on the effect of the order on the assumption of the License Agreement, since that issue was on appeal. The order in aid of confirmation was also appealed.

The District Court affirmed all three orders. The Eleventh Circuit Court of Appeals, while neither affirming nor reversing the orders, remanded the case, because none of the orders expressly dealt with the assumption of the License Agreement in the context of the Plan, as it currently stood. Before the Bankruptcy Court could decide the issue on remand, however, the Debtors, including Hayes, filed chapter 11 cases in this Court on October 9, 1998.

After attempts to reorganize in their second case, the Debtors determined that reorganization was not feasible and announced a decision, with the consent of NationsCredit and the approval of this Court, to liquidate their assets. On February 12, 1999, the Debtors conducted an auction of their assets. One of the auction lots, Lot 15, consisted of the EZJack related assets and included the License Agreement. Xircom was the highest bidder for Lot 15, offering $4 million.

The Debtors accepted the Xircom bid and filed a motion for approval of the sale. Xircom's bid was conditioned on obtaining a final order authorizing the transfer to it of the License Agreement. 3Com filed a

timely objection to the sale to Xircom. Testimony was presented at a hearing held on March 19, 1999, and the parties submitted briefs in support of their positions.

Subsequently, a Chapter 11 trustee was appointed in this case. 3Com filed a motion requesting authority to file a supplemental brief on the issue of whether the appointment of a Chapter 11 trustee had any effect on the sale to Xircom. After hearing, we granted the request for supplemental briefing. The Trustee in its pleading has adopted the arguments presented by the Debtors.[2]

## III. *DISCUSSION*

Before addressing 3Com's substantive arguments, we must decide two preliminary matters: 3Com's standing and the Trustee's standing.

### A. *3Com's Standing*

The Debtors/Trustee assert as a preliminary matter that 3Com has no standing because the License Agreement was with Megahertz, not 3Com. Evidence was presented by 3Com establishing it as the successor, by a three-step merger and acquisition, to Megahertz.[3] The Debtors/Trustee assert that, except for the first merger, Megahertz did not get the Debtors' consent as expressly required by ¶ 7.3 of the License Agreement.

To resolve this issue, it is necessary to analyze the language of ¶ 7.3, in conjunction with ¶ 7.4 of the License Agreement.

---

2. The Trustee also sought to strike portions of 3Com's supplemental pleading as duplicative or impertinent. While some of the arguments may be duplicative, 3Com's pleading does raise issues unique to the Trustee. The impertinent assertion referred to 3Com's argument that the Trustee cannot assume the License Agreement and convey it through a plan of reorganization or by other means. The Trustee asserts that this issue is not yet before the Court since no plan has been filed. However, the issue of the whether the Trustee can assume the License Agreement, a necessary predicate to any plan of reorganization, is before the Court and is decided below.

3. Megahertz's parent merged into a subsidiary of Vystar Group, Inc., which changed its name to Megahertz Holdings. (This was with consent of Hayes.) Thereafter, U.S. Robotics Corporation acquired Megahertz Holdings. Later, 3Com acquired U.S. Robotics. Following the U.S. Robotics and 3Com acquisitions, Megahertz Holdings remained a separate legal entity though it changed its name to U.S. Robotics Mobile Communications Corporation. Thereafter, it was merged into 3Com in a series of roll-up mergers.

Those provisions (as amended by the Amendment dated June 23, 1993) state:

> 7.3 Neither this Agreement, nor any licenses or rights hereunder, in whole or in part, granted by Hayes to Licensee [Megahertz], shall be assignable or otherwise transferable without Hayes' prior written consent.

> 7.4 Neither party to this Agreement nor any Subsidiary of either party may assign any of the Licensed Patents or Licensee's Patents to any third party without making such assignment subject to the terms and conditions of this Agreement.

(License Agreement at pp. 16 & 22.)

■ 3Com asserts that, as a result of the mergers and acquisitions, it is the owner of the Megahertz patented technology.[4] Paragraph 7.4 of the License Agreement does not bar assignment of the Patents, nor does it require consent of the Debtors before the Patents can be assigned, *unless* the assignment is not subject to the terms of the License Agreement.

■ There is no suggestion that at anytime, even now, 3Com or its predecessors asserted that the transfer of the Patents, by the mergers and acquisitions, affected the terms of the License Agreement.[5] Therefore, the License Agreement did not require Hayes' consent before 3Com obtained the Patents by merger. Consequently, 3Com is the party with standing

4. Under federal patent law, patents are personal property. 35 U.S.C. § 261. By operation of state law, the patents became the property of the surviving corporation. Utah Code Ann. § 16–10a–1106(1)(b) (1998); 8 Del.C. § 259(a).

5. In fact, 3Com acknowledges that federal law regarding the assignment of patents makes patent assignments subject to the conditions of any licenses or other rights previously conferred by the patent holders. *Waterman v. Mackenzie*, 138 U.S. 252, 256, 11 S.Ct. 334, 34 L.Ed. 923 (1891); *American Dirigold Corp. v. Dirigold Metals Corp.*, 125 F.2d 446, 452 (6th Cir.1942).

6. For example, 3Com is not asserting rights as licensee under section 365(n) to continue

to assert the patent holder's rights under the License Agreement.

■ One of the rights a patent holder has is the exclusive right to exclude all other persons from practicing the patented inventions during the effective period of the patent. 35 U.S.C. § 154. This monopoly is the essence of the patent and is the basis for the patent holder's exclusive right to make, use, and sell the patented technology. *Waterman v. Mackenzie*, 138 U.S. 252, 255–56, 11 S.Ct. 334, 34 L.Ed. 923 (1891) (construing prior statute); *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 135, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969). Of course, as noted above, 3Com's rights as patent holder are subject to the License Agreement executed by its predecessor in interest.

This interpretation of ¶ 7.4 is not in conflict with ¶ 7.3. The latter provision states that Hayes' consent is required only for an assignment of the License Agreement or the rights granted by Hayes thereunder to Megahertz. 3Com is not seeking to assert the rights as Licensee granted by Hayes to Megahertz under the License Agreement, rather it is seeking to assert the rights it has as patent owner.[6] Thus, we conclude that ¶ 7.4, not ¶ 7.3, is the operative provision and that 3Com has standing as the patent owner to object to the Debtors' assignment of the License Agreement.[7]

to use the technology of Hayes granted to Megahertz under the License Agreement.

7. 3Com also argued that even if the merger transactions somehow affected 3Com's standing to enforce the License Agreement, 3Com's subsidiary, Information Systems Group, Inc. ("ISG") had standing. ISG, which was an original subsidiary of Megahertz Corporation, has remained a separate legal entity. Applying the argument of the Debtors/Trustee that subsidiaries had rights under the License Agreement, 3Com argues that ISG has standing. Because 3Com has standing as the patent owner, it is unnecessary to address this issue.

B. *Effect of Appointment of Chapter 11 Trustee*

3Com argues that the Chapter 11 Trustee cannot effectuate the transfer of the License Agreement irrespective of whether the Debtors could for two reasons: (1) the Trustee only obtained title to property of the estate as of the time he was appointed which did not include unassumed executory contracts such as the License Agreement, and (2) the Trustee did not succeed to the rights of the Debtors under the License Agreement because it is a personal contract.

1. *Property of the estate*

■ A bankruptcy estate is created upon the filing of a bankruptcy petition, which includes all the debtor's legal and equitable interests in property. 11 U.S.C. § 541. Generally, the trustee succeeds to all the debtor's rights in property of the estate. 3Com asserts an exception to this general rule: an executory contract does not become property of the estate until it is assumed. 3Com cites cases which state this general proposition. *See, e.g., In re Qintex Entertainment, Inc.,* 950 F.2d 1492, 1495 (9th Cir.1991) (quoting *In re Tleel,* 876 F.2d 769, 770 (9th Cir.1989)); *In re Public Service Co. of New Hampshire,* 884 F.2d 11 (1st Cir.1989).

■ The cases cited by 3Com are factually distinguishable [8] and do not stand for the broad proposition that the trustee does not have standing to assume an executory contract. In fact, such a conclusion is directly contrary to the express language of the Bankruptcy Code: *"the trustee,* subject to the court's approval, may assume or reject any executory contract...." 11 U.S.C. § 365(a) (emphasis added). When the language of a statute is plain, it must

be followed. *See, e.g. Patterson v. Shumate,* 504 U.S. 753, 757, 112 S.Ct. 2242, 119 L.Ed.2d 519 (1992); *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989).

■ We conclude, therefore, that the Trustee clearly has standing in this case to ask the Court to approve the assumption and assignment of the License Agreement.

2. *Trustee succeeds to debtors' interests*

3Com asserts that the Trustee did not succeed to the Debtors'. interests in the License Agreement because of the personal nature of that agreement. 3Com cites cases for the proposition that a receiver appointed under state law does not generally succeed to the licensee's rights under a patent license agreement. *See, e.g., Waterman v. Shipman,* 55 F. 982, 986 (2d Cir.1893) (receiver under New York state law though vested with all legal and equitable property of debtor did not succeed to rights under nonassignable patent license since it was purely personal).

■ That case, however, involves a receiver appointed under state law, not a trustee appointed under the Bankruptcy Code. The rights of a trustee expressly include the rights the debtor has under executory contracts. 11 U.S.C. §§ 365 & 541. We conclude that the Trustee succeeded to whatever rights the Debtors had in the License Agreement.

We turn, therefore, to 3Com's substantive arguments. 3Com's objections fall into two general categories: (1) the Debtors lost all rights under the License Agreement as a result of the first bankruptcy case, because it was not properly assumed or assigned in that case; and (2)

---

**8.** *Public Service* involved a party's attempt to set off amounts it owed to the debtor under one contract against anticipated damages caused by the expected rejection of a separate executory contract. *Qintex* held that an executory contract must be assumed before it can be sold. *See* discussion at Part D2, *infra.*

*Tleel* involved the avoidance of an alleged constructive trust on proceeds from the sale of a land sale contract. None held that a trustee does not have standing to seek assumption or rejection of an executory contract.

even if the Debtors retained some rights under the License Agreement, it cannot be assumed and assigned because applicable non-bankruptcy law prohibits it.

### C. Assumption and Assignment in the First Bankruptcy Case

#### 1. Collateral estoppel/res judicata

3Com asserts that the decisions of the Georgia Courts are binding on several points: (1) that the License Agreement is an executory contract; (2) that the License Agreement could not be assigned; and (3) that the License Agreement was never assumed in the first bankruptcy case.

■■■ The federal doctrine of issue preclusion is well-established in the Third Circuit and requires that before a party will be estopped from relitigating an issue:

> (1) the issue sought to be precluded must be the same as the one involved in the prior action; (2) the issue must have been actually litigated; (3) the issue must have been determined by a valid and final judgment; and (4) the determination must have been essential to the prior judgment.

*Wolstein v. Docteroff (In re Docteroff),* 133 F.3d 210, 214 (3d Cir.1997) (citations omitted). *See also In re Ross,* 602 F.2d 604, 608 (3d Cir.1979) (quoting *Haize v. Hanover Insurance Co.,* 536 F.2d 576, 579 (3d Cir.1976)). In determining whether an order should be given preclusive effect, "the second court should consider whether the parties were fully heard, whether a reasoned opinion was filed, and whether that decision could have been, or actually was, appealed." *First Jersey National Bank v. Brown (In re Brown),* 951 F.2d 564, 569 (3d Cir.1991).

#### a. Only Hayes filed bankruptcy

The Debtors/Trustee argue that, even if collateral estoppel applies, it is not applica-ble to the Debtors other than Hayes. Only Hayes was a debtor in the first bankruptcy; none of the subsidiaries were. The subsidiaries are parties to the License Agreement and they retained their rights thereunder, even if Hayes' were lost.

■■ 3Com responds that the License Agreement gave the subsidiaries only limited rights which were derivative of, and dependent upon, Hayes having rights. The License Agreement expressly states that it is between Hayes and Megahertz. The License Agreement gives "to Hayes and each of Hayes [sic] Subsidiaries, a non-exclusive royalty-free irrevocable license under all of Licensee's Patents to make, manufacture, use or sell Hayes' Licensed Products, to have Hayes' Licensed Products made for Hayes' use or sale, and for the use of, or sale by, any of Hayes' Subsidiaries, and to use any process in manufacturing any product of Hayes." (License Agreement at ¶ 2.2.) The definition of Hayes' Licensed Products includes only products made by or for Hayes. The grant is extended to Hayes' subsidiaries only to facilitate its use by Hayes. It was not intended to be an independent grant to the Hayes' subsidiaries to use for themselves to make other, non-Hayes products.

Further, the subsidiaries have rights only so long as they are, in fact, subsidiaries of Hayes. The definition of Hayes' Subsidiary under the License Agreement requires that Hayes own at least 50% of the entity. (*Id.* at ¶ 1.21.) Thus, the transfer to a non-subsidiary would eliminate their rights, unless the purchaser remained a subsidiary of Hayes. Similarly, if the stock in the subsidiary were to be sold by Hayes, the entity would no longer have any rights under the License Agreement.[9]

Consequently, we conclude from the express language of the License Agreement

---

**9.** The Debtors/Trustee and NationsCredit suggest that even if the sale to Xircom is not approved, the same result could be achieved in a plan of reorganization which transfers the stock of a subsidiary to Xircom. For the reasons stated here and in Part D, we disagree.

that the subsidiaries' rights are only derivative of Hayes and that they have no independent rights thereunder. Thus, to the extent collateral estoppel bars relitigation of any issue by Hayes, it bars the other Debtors and the Trustee as well.

b. *NationsCredit was not a party*

NationsCredit argues, as well, that preclusion may not arise with respect to it, because it was not a party to the first bankruptcy case or a participant in the litigation that gave rise to the orders issued in that case. *See Kelly v. Armstrong,* 141 F.3d 799 (8th Cir.1998) (even assuming sufficient similarity of issues, collateral estoppel could not be applied to bar relitigation of such issues by transferees, who were not parties to that litigation); *see also In re Atrium High Point Ltd. Partnership,* 189 B.R. 599 (Bankr.M.D.N.C. 1995) (debtor's pre-petition waiver of rights provided under the Bankruptcy Code are not binding on third party creditors).

■ However, NationsCredit has no direct interest in the License Agreement; it is not a party to the License Agreement. Rather, its interests are only derivative of the Debtors: it has a security interest in property of the Debtors, including contract rights. Therefore, NationsCredit's rights can rise no higher than the Debtors' rights and to the extent a decision on the Debtors' rights in the License Agreement is binding on the Debtors, it binds NationsCredit. *See, e.g., In re James Wilson Associates,* 965 F.2d 160, 168–70 (7th Cir. 1992) (secured party had no standing to be heard on issue of enforceability of deadline for assumption or rejection of lease which served as its collateral).

c. *The License Agreement is executory*

■ Turning to the issue of the preclusive effect of the Georgia Courts' decisions, 3Com asserts that the Georgia Bankruptcy Court, in its order dated February 14, 1996, held that the License Agreement was an executory contract subject to the provisions of section 365. (Appendix of Documents filed by 3Com, Tab 3, p. 4.) 3Com asserts that this issue was actually litigated. However, nowhere in the Georgia Bankruptcy Court's opinion is a finding to that effect. It appears that the Court assumed the contract was executory, since it articulated the issue before it as "whether or not the Debtor in Possession can assume the executory License Agreement with Megahertz...." (*Id.*)

Although 3Com asserts that the issue was actually litigated, we cannot tell that from the Bankruptcy Court's opinion. The briefs filed by the parties in that case were not made part of the record in this case. Further, 3Com's assertion that Hayes argued to the Georgia Bankruptcy Court that the License Agreement was not executory appears to be contradicted by the Schedules filed by Hayes in the Georgia bankruptcy case, where it listed the License Agreement in Schedule G as an Executory Contract. (Appendix of Documents filed by 3Com, Tab 2.) Thus, we cannot conclude from the record before us that the issue was actually litigated in the prior case.

Nor was the issue necessary to the Georgia Bankruptcy Court's ultimate decision that the License Agreement could be assumed by Hayes in its Plan. If the License Agreement were not executory, it would not be subject to the proscriptions on assumption contained in section 365 and would survive the bankruptcy case unaffected.

Further, the issue before us is different from that decided by the Georgia courts. We must decide whether the License Agreement was executory on October 9, 1998, the day the second bankruptcy cases were filed.[10] The issue the Georgia Court considered was whether the License Agreement was executory in November, 1994. The four year difference precludes

---

10. The time for determining whether a contract is executory is when the bankruptcy petition is filed. *See, e.g., In re Columbia Gas System, Inc.,* 50 F.3d 233, 240 (3d Cir.1995).

a decision with respect to the earlier date from being determinative as to the later date. Collateral estoppel does not apply.

### d. *The License Agreement could not be assigned*

3Com asserts that the Georgia Bankruptcy Courts concluded that the License Agreement was not assignable (and that that conclusion was not disturbed on appeal). The Debtors/Trustee respond that that conclusion was mere dicta, unnecessary to the Court's conclusion that Hayes could assume the contract.

■■■ We agree with the Debtors/Trustee. Dicta is *not covered by the doctrine of* collateral estoppel because the latter requires that the conclusion sought to be given preclusive effect actually formed a necessary part of the ultimate determination reached by the first court. *See, e.g., In re Cassidy,* 892 F.2d 637, 640 (7th Cir.1990); *Coleman v. Miller,* 117 F.3d 527, 530 n. 7 (11th Cir.1997)

■■■ The Georgia Bankruptcy Court concluded that under its Plan, Hayes was *not* assigning the License Agreement. Therefore, its discussion of *whether* the License Agreement could be assigned was unnecessary to its ruling and constitutes classic dicta. This is evident from the end of the Court's decision where it stated:

> In this case, the post-confirmation debtor under the Debtor's proposed plan of reorganization will be one and the same entity as the pre-petition Debtor and the Debtor in Possession. The contemplated performance of the License Agreement by the post-confirmation Debtor will be the same as if no petition had been filed. Therefore, *there will be no assignment* of the License Agreement from the Debtor in Possession to the post-confirmation reorganized Debtor within the meaning of the non-bankruptcy anti-assignment law. *Accordingly, the issue of assignability* of the License Agreement from the Debtor in Possession to the post-confir-

mation Debtor *is, in essence, rendered moot.*

(Appendix of Documents, Tab 3 at p. 13 (emphasis added)).

Thus, there can be no preclusive effect to the Georgia Court's discussion of the assignability of the License Agreement.

### e. *The License Agreement was never assumed*

3Com asserts that the Debtors/Trustee now have no rights in the License Agreement because that License Agreement was never assumed in the Georgia case.

However, 3Com ignores the effect of the Georgia Courts' rulings. The Bankruptcy Court entered two orders, one holding that the License Agreement could be assumed pursuant to the Plan and the other confirming the Plan. Those orders were appealed. The subsequent order in aid of confirmation did not modify the Plan. (*Id.,* Tab 8 at p. 2.) In fact, the Plan apparently expressly authorized changes to the identity of new investors and the terms of the funding of the Plan. That order also did not *change* the fact of the assumption of the License Agreement. The Bankruptcy Court expressly left that issue as it stood: the order allowing assumption being on appeal. The District Court subsequently affirmed the assumption order. (*Id.,* Tab 10 at pp. 3–4.) The Eleventh Circuit *remanded* the case for the Bankruptcy Court to decide the effect, if any, of the order in aid of confirmation on the assumption order. (*Id.* at Tab 12.) That remand is pending, having been stayed by this bankruptcy case.

The Georgia Bankruptcy Court on remand may conclude that the order in aid of confirmation did not affect its assumption order. Normally, we would be inclined to wait until the Georgia Bankruptcy Court renders its decision on whether the License Agreement survived the Georgia case. However, because we conclude below that, even if the License Agreement were still viable, the Debtors/Trustee cannot assume the License Agreement now,

we will not direct the parties to obtain a ruling from the Georgia Court first.

### D. Assumption and Assignment in this Case

#### 1. The License Agreement is not assignable

3Com asserts that the Debtors/Trustee may not assume and assign the License Agreement to Xircom under the plain language of section 365(c)(1) which provides:

The trustee may not *assume or assign* any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment. . . .

11 U.S.C. § 365(c)(1) (emphasis added).

#### a. The License Agreement is executor

Though we cannot rely on the Georgia Courts' decision on this issue, we readily conclude that the contract is executory. There is performance due on each side: permitting the use of patented technology by the other party.

██ The traditional test is the "Countryman" definition which provides that a contract is executory only where the obligations "of *both* the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance

of the other." Countryman, Executory Contracts in Bankruptcy; Part I, 57 Minn.L.Rev. 439, 460 (1973) (emphasis added). The Third Circuit has adopted the Countryman definition, *Sharon Steel Corp. v. National Fuel Gas Distribution Corp.*, 872 F.2d 36, 39 (3d Cir.1989), and has emphasized that it is not a technical definition, but one which requires a court to determine whether the failure to perform an obligation under the contract would constitute a material breach. *In re Columbia Gas System, Inc.*, 50 F.3d 233, 244 n. 20 (3d Cir.1995).

██ The Debtors/Trustee assert that the License Agreement is not executory, under the traditional test,[11] because no performance by them was due at the commencement of these cases. Thus, the Debtors/Trustee submit that the License Agreement was, in fact, a sale. We disagree.

Each party had at least one material duty to perform under the License Agreement: to refrain from suing the other for infringement of any of the patents covered by the license. This performance is material since the licensor's promise to refrain from suing the licensee for infringement is the *raison d'etre* for a patent license. *See, e.g., DeForest Radio Tel. & Tel. Co. v. United States*, 273 U.S. 236, 242, 47 S.Ct. 366, 71 L.Ed. 625 (1927) (a waiver of the right to sue for infringement created a nonexclusive patent license); *Jacob Maxwell, Inc. v. Veeck*, 110 F.3d 749, 753 (11th Cir.1997) (implied nonexclusive license to use copyrighted material barred suit); *Spindelfabrik Suessen–Schurr Stahlecker & Grill, GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1081 (Fed.Cir.1987) (a patent license agreement is nothing more than a promise by licensor not to sue licensee).

Further, each party was required to grant the other party sub-licenses under

---

**11.** Because we find the contract is executory under the traditional test, asserted by the Debtors/Trustee, we need not consider 3Com's argument that it is executory under the alternative "functional" approach.

third parties, patents, a duty which is coextensive with the terms of the License Agreement. (License Agreement at ¶ 2.3.) While the Debtors/Trustee dispute Hayes' obligation to grant additional licenses under patents owned by Hayes, the Debtors/Trustee do not argue that these sublicense obligations did not exist. We agree with 3Com that even though these sublicensing obligations may be remote, that does not render the obligations non-executory. *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1046 (4th Cir.1985) (the "contingency of an obligation does not prevent its being executory").

In *Everex Systems, Inc. v. Cadtrak Corp. (In re CFLC, Inc.)*, 89 F.3d 673 (9th Cir.1996), the Ninth Circuit found that a licensor's obligation to forbear from suing the licensee (and to mark all products made under the license) was both a significant and continuing performance obligation that made the contract executory as to the licensor. 89 F.3d at 677. Similarly, we conclude that the License Agreement was executory at the commencement of these cases.

■ The Debtors/Trustee seek to avoid this conclusion by arguing that the License Agreement was, in fact, a sale. They point to the fact that it was irrevocable and royalty free. The Debtors/Trustee cite *In re DAK Industries, Inc.*, 66 F.3d 1091 (9th Cir.1995) in support of their position. The agreement in *DAK* permitted the debtor nonexclusive rights to sell Microsoft's Word for Windows software to its customers, who were the ultimate users. In *DAK*, the Court concluded that the software "license" was, in fact, a sale because (1) the pricing, and timing of payments, suggested a sale not a lease, (2) the debtor received all its rights at the commencement of the agreement, and (3) the debtor had the right to sell the technology, not simply use it. *Id.* at 1095–96.[12]

■ We find the latter element to be missing here: under the License Agreement the Debtors do *not* have the right to sell the Megahertz technology. This is significant. An agreement is a sale of the patent rights only if it conveys: (1) the whole patent, comprising the exclusive right to make, use, and sell the invention; (2) an undivided share of that exclusive right; or (3) an exclusive right to practice the invention within a specified territory. *Waterman v. Mackenzie*, 138 U.S. at 255, 11 S.Ct. 334. Unless the writing conveys some or all of the right to exclude others from practicing the invention, it will not convey an interest in the patent, but is a mere license. 138 U.S. at 256, 11 S.Ct. 334. Therefore, a "non-exclusive" grant of the rights to make, use, and sell the patented invention, by its very terms, is not an assignment, but a mere naked license. *Preload Enterprises, Inc. v. Pacific Bridge Co.*, 86 F.Supp. 976, 979 (D.Del.1949) ("if the rights conferred upon the alienee are not exclusive rights investing in him alone or him jointly with the alienor, the monopoly is not transferred and the conveyance is a license").[13]

In this case, the License Agreement, by its very terms, is a "non-exclusive" right only to make, use, and sell Megahertz's

---

12. *DAK* is further distinguishable because it dealt, not with the assumption and assignment of an executory contract, but with a request for a payment of an administrative claim under a prepetition contract which the Court found provided no benefit to the estate post-petition. 66 F.3d at 1096.

13. The other authority cited by the Debtors/Trustee is similarly distinguishable. In *Chesapeake Fiber Packaging Corp. v. Sebro Packaging Corp.*, 143 B.R. 360 (Bankr.D.Md.

1992) *aff'd*, 8 F.3d 817 (4th Cir.1993), the agreement in dispute contained language of conveyance: "[patent holder] hereby sells, assigns, transfers and sets over to [alienee] its entire right, title and interest in, to, and under the aforesaid Invention(s) and any and all Letters Patent ..." *Id.* at 363. Because of that language, the Court concluded it was a sale not an executory contract or license. There is no similar language in the License Agreement at issue here.

patented technology in Hayes' licensed products. (License Agreement at ¶ 2.2). In other words, the License Agreement did *not* convey to the Debtors the exclusive right or some part of the exclusive right to practice the invention and did not grant any right to exclude others from practicing the patents. Thus, the License Agreement did not convey any part of the patent monopoly or the underlying patents. We conclude, therefore, that it was not a sale but a license which was executory at the time of the filing of the bankruptcy cases.

b. *Applicable law excuses 3Com from accepting performance from a third party*

The "long standing federal rule of law with respect to the assignability of patent license agreements provides that these agreements are personal to the licensee *and not assignable unless expressly made so in the agreement.*" *Unarco Industries, Inc. v. Kelley Co., Inc.,* 465 F.2d 1303, 1306 (7th Cir.1972), *cert. denied,* 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 590 (1973) (citations omitted) (emphasis added). This federal rule in favor of allowing a patent holder to choose who, if anyone, may use the patented invention promotes the important federal policy underlying patent law:

> to "foster and reward invention" [which] is primarily accomplished by granting a 17 year monopoly for the patent holder to exploit. Limiting assignability to licenses in which the patent holder expressly agrees to assignment aids the patent holder in exploiting the patent and thus "rewards" the patent holder. Free assignability of a nonexclusive patent license without the consent of the patent holder is inconsistent with patent

monopoly and thus inconsistent with federal policy.

*In re CFLC, Inc.,* 174 B.R. 119, 123 (N.D.Cal.1994), *aff'd sub nom., Everex Systems, Inc. v. Cadtrak Corp. (In re CFLC, Inc.),* 89 F.3d 673 (9th Cir.1996).

c. *3Com does not consent*

3Com clearly does not consent to the sale to Xircom in this case. 3Com's objection to Xircom is very basic: Xircom is a direct competitor of 3Com and allowing Xircom to use 3Com's technology will eliminate any competitive advantage in the market which 3Com may have as a result of that technology.[14] This is exactly what the patent laws are designed to prevent.

The Debtors/Trustee argue that 3Com (by its predecessor Megahertz) has agreed to the assignment. They point to the language of the License Agreement at ¶ 7.3 which states that Megahertz cannot assign the License Agreement without Hayes' consent. There is no similar provision barring assignment by the Debtors.

The Debtors/Trustee rely on the doctrine of *expressio unius est exclusio alterius* which provides that when certain matters are discussed in a contract, other similar matters not mentioned are intended to be excluded. *See, e.g., Plumbers & Steamfitters Local No. 150 Pension Fund v. Vertex Construction Co., Inc.,* 932 F.2d 1443, 1449 (11th Cir.1991) (collective bargaining agreement which incorporated certain agreements, but did not mention others, held not to incorporate those not mentioned); *Macon Auto Auction, Inc. v. Georgia Cas. & Sur. Co.,* 104 Ga.App. 245, 251, 121 S.E.2d 400 (1961) (because indemnity agreement expressly stated that one provision was a condition precedent, all other provisions were necessarily not conditions precedent).

14. The testimony presented at trial by 3Com was that there are effectively three types of products on the market which allow a laptop computer to connect to communications devices: the basic dongle which many manufacturers produce, the 3Com XJack technology (which the Debtors use in the EZJack products) and Xircom's Real Port technology. (N.T. at pp. 25–27.) Thus, allowing Xircom access to 3Com's technology has a significant effect. (*Id.* at pp. 27–28, 51.)

This rule of construction is well-recognized black-letter law. 3 CORBIN ON CONTRACTS § 552 (1998) ("If one subject is specifically named, ... and there are no general words to show that other subjects of that class are included, it may reasonably be inferred that the subjects not specifically named were intended to be excluded."); 11 WILLISTON ON CONTRACTS § 1295 (1998) ("Covenants are implied in two situations, one where the covenant is so clearly within the contemplation of the parties that they deemed it unnecessary to express it, and the other where the covenant was probably beyond the pale of conscious thought of the parties but is necessary in order to give effect to and effectuate the purpose of the contract as a whole.")

The Debtors/Trustee seek to apply the doctrine of *expressio unius est exclusio alterius* to this case as follows. The License Agreement provides at ¶ 7.3, which relates solely to Megahertz:

> Neither this Agreement, nor any licenses or rights hereunder, in whole or in part, granted by Hayes to Licensee [Megahertz], shall be assignable or otherwise transferable without Hayes' prior written consent.

(License Agreement at ¶ 7.3.) The License Agreement contains no corresponding prohibition with respect to Hayes. Under the *expressio unius* doctrine, the Debtors/Trustee argue that such a deliberate omission is tantamount to an express grant of permission and, thus, this Court may find that the License Agreement expressly provides that Hayes and its subsidiaries may freely assign their rights under the License Agreement.

■ However, we cannot conclude in this case that silence is express consent to the assignment, particularly where federal law holds the opposite: that silence, i.e., lack of express agreement, means the agreement is *not* assignable. As noted above, license agreements are personal to the licensee and not assignable *unless expressly made so in the agreement. Unar-*

co, 465 F.2d at 1306. "Under well-established law the holder of a nonexclusive patent license may not assign its license *unless the right to assign is expressly provided for in the license agreement.*" *Verson Corp. v. Verson Int'l Group PLC,* 899 F.Supp. 358, 363 (N.D.Ill.1995) (emphasis added).

The argument of the Debtors/Trustee is based on a faulty legal premise—that under applicable law a patent license *is* assignable in the absence of an express provision *prohibiting* assignment. But this is exactly backwards: "patent licenses are personal and not assignable unless expressly made so ... [and this] has been the rule at least since 1852 when the Supreme Court decided *Troy Iron & Nail v. Corning,* 55 U.S. (14 How.) 193, 14 L.Ed. 383 (1852)." *PPG Industries, Inc. v. Guardian Industries Corp.,* 597 F.2d 1090, 1093 (6th Cir.), *cert. denied,* 444 U.S. 930, 100 S.Ct. 272, 62 L.Ed.2d 187 (1979). Rather, "express" authorization means just that—precise language granting, in black and white, the exact authority that is sought.

■ Here, the License Agreement is at best silent with respect to Hayes' entitlement to assign its rights under the contract. Where the provisions of a patent license are silent on the question of assignability, the license is nontransferable. *Walter A. Wood Harvester Co. v. Minneapolis–Esterly Harvester Co.,* 61 F. 256, 258 (C.C.D.Minn.1894) (patent license that did not contain the words "heirs," "successors" or "assigns" or words of similar import was not assignable). Thus, under federal law, the rights of Hayes as licensee under Megahertz's patents are clearly nonassignable.

This finding is bolstered by the language of ¶ 7.1 of the License Agreement which provides:

> Nothing contained in this Agreement shall be construed as ... [c]onferring by *implication, estoppel or otherwise* upon any grantee any license or other right

under any Patent, except the licenses and rights *expressly* granted to such grantee.

(License Agreement at ¶ 7.1 (emphasis added).)

The instant case is distinguishable from the case cited by the Debtors/Trustee in support of their position. *See Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489 (1st Cir.1997). In the *Pasteur* case, the written provision was contrary to patent law, while the provision presumed by the contract's silence was consistent with patent law. 104 F.3d at 494. Thus, the application of the *expressio unius est exclusio alterius* doctrine in *Pasteur* did not result in the creation of an unwritten contract in contravention of patent law. Rather, the *Pasteur* court gave effect to the parties' election to deviate from the law where that election was in writing.

Here, the opposite is true. The written provision (¶ 7.3) is consistent with patent law and the provision which the Debtors/Trustee wish us to create by the contract's silence is directly contrary to patent law. In the face of patent law which requires an express undertaking before it is assignable, we will not presume such consent by mere silence.[15]

Because the License Agreement is executory, non-assignable under applicable nonbankruptcy law, and 3Com does not consent to its assignment, the Debtors/Trustee may not assign it under the express language of section 365.

### 2. The License Agreement cannot be sold pursuant to § 363

The Debtors/Trustee seek to avoid this result by asserting that they are not seeking to assume and assign the License Agreement under section 365. Rather, they argue they are "selling" the License Agreement pursuant to section 363. However, the courts have held that, with respect to an executory contract, until it is assumed under section 365, the debtor has nothing to sell under section 363. *See, e.g., Qintex*, 950 F.2d 1492; *Tleel*, 876 F.2d at 770–71 (treating motion to sell executory contract as motion to assume and assign).

In *Qintex*, the Court stated:

Section 363 of the Code allows a debtor to sell assets of the estate, after notice and a hearing, including a sale of substantially all the assets of the estate. 11 U.S.C. § 363(b)(1). An executory contract does not become an asset of the estate until it is assumed pursuant to § 365(a) of the Code. *See* § 365(a); *In re Tleel*, 876 F.2d 769, 770 (9th Cir.1989) ("Unless and until rights under an executory contract are timely and affirmatively assumed by the trustee, they do not become property of the debtor's estate"). Therefore, the sale of Quintex's assets will not include any contract that is executory unless Quintex first assumes the contract.

950 F.2d at 1495.

■■■■ We agree with the *Qintex* conclusion. A debtor cannot avoid the requirements of section 365 by saying it is "selling" a lease or executory contract, rather than assuming and assigning it.

■■■ To hold otherwise would lead to ludicrous results. If the debtor does not assume an executory contract, it is deemed rejected. *See, e.g., James Wilson Associates*, 965 F.2d at 169; *Sea Harvest Corp. v. Riviera Land Co.*, 868 F.2d 1077, 1079 (9th Cir.1989) (the statutory presumption of rejection, unless the debtor or trustee acts affirmatively to assume a lease, protects the estate from unexpected liability). Thus, if a debtor does not assume an executory contract before he sells it (as the Debtors/Trustee argue they can here), the buyer may be purchasing an illusion: the

---

15. We are also cognizant of the general doctrine that we should not construe a contract to render one of its provisions meaningless. *See, e.g., Chemical Bank v. Affiliated FM Ins. Co.*, 815 F.Supp. 115 (S.D.N.Y.1993). That is not the result here. Our conclusion simply means that ¶ 7.3 is redundant; it mirrors existing law.

executory contract will disappear on conclusion of the bankruptcy case.

Thus, for the Debtors/Trustee to "sell" the License Agreement to Xircom, they must first assume it under section 365.

### 3. *The License Agreement is not assumable*

■ The language of section 365(c)(1) also clearly and unambiguously prohibits the assumption of the License Agreement. That section states a debtor in possession "*may not assume or assign* any executory contract or unexpired lease of the debtor," if applicable nonbankruptcy law precludes it. 11 U.S.C. § 365(c)(1) (emphasis added).

Some federal courts have rejected the plain language of the statute and applied an "actual test" to allow assumption of contracts that are non-assignable and non-delegable under applicable law. *See, e.g., Pasteur,* 104 F.3d at 493. Those federal courts reason that where the contract is merely being assumed by the debtor, the policy behind the nonbankruptcy law which prohibits assignment is still upheld.[16]

■ The "actual test" approach, however, has been criticized as ignoring the plain language of the statute. The majority of the Circuit Courts that have addressed this issue have concluded that the plain language [17] of section 365(c)(1) requires application of a hypothetical test:

> The literal language of § 365(c)(1) is thus said to establish a "hypothetical test": a debtor in possession *may not assume* an executory contract over the nondebtor's objection if applicable law would bar assignment to a hypothetical

third party, *even where the debtor in possession has no intention of assigning* the contract in question to any such third party. *See In re James Cable,* 27 F.3d at 537 (characterizing § 365(c)(1)(A) as presenting "a hypothetical question"); *In re West Elecs.,* 852 F.2d at 83 (same).

> *Perlman v. Catapult Entertainment, Inc. (In re Catapult Entertainment, Inc.),* 165 F.3d 747, 750 (9th Cir.1999) (emphasis added). *See also, City of Jamestown v. James Cable Partners, L.P. (In re James Cable Partners, L.P.),* 27 F.3d 534, 537, *reh'q denied,* 38 F.3d 575 (11th Cir.1994).

Of particular significance in this case, the Third Circuit Court of Appeals has followed the express language of the statute and adopted the hypothetical test. *In re West Electronics, Inc.,* 852 F.2d 79 (3d Cir.1988). In *West Electronics,* the Third Circuit held that a debtor could not assume a defense contract because the federal Anti–Assignment Act prohibited the assignment of that contract. Because the debtor could not assume the contract, the Court held that relief from the stay should be granted to permit the government to terminate the contract. 852 F.2d at 82.

Although the *West Electronics* case dealt with a federal statute which barred assignment, the Third Circuit held that section 365(c)(1) similarly applied in other instances:

> Thus, if non-bankruptcy law provides that the government would have to consent to an assignment of the West contract to a third party, *i.e.,* someone "other than the debtor or the debtor in possession," then West, as the debtor in possession, cannot assume that contract. *This provision limiting assumption of*

---

16. The Georgia Bankruptcy Court adopted this reasoning, even though the Eleventh Circuit had articulated the hypothetical test. (Appendix of Documents, Tab 3 at pp. 7–12.)

17. When a statute is clear and unambiguous on its face, recourse to legislative history is inappropriate. *See, e.g., Toibb v. Radloff,* 501 U.S. 157, 162, 111 S.Ct. 2197, 115 L.Ed.2d

145 (1991) ("this Court has repeated with some frequency: 'Where, as here, the resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear.' "); *United States v. Rush,* 874 F.2d 1513, 1514 (11th Cir.1989).

*contracts is applicable to any contract subject to a legal prohibition against assignment. See In re Pioneer Ford Sales, Inc.,* 729 F.2d 27 (1st Cir.1984); *In re Braniff Airways, Inc.,* 700 F.2d 935, 943 (5th Cir.1983).

*Id.* (emphasis added).

Like the language of the statute, the decision in *West Electronics* is clear and unequivocal. We are bound by Third Circuit law on this point. The Debtors/Trustee may not assume the contract with 3Com.[18]

## IV.   CONCLUSION

For the foregoing reasons, we conclude that the License Agreement is an executory contract which under its terms and applicable nonbankruptcy law is not assignable without 3Com's consent. Since 3Com does not consent, the Debtors/Trustee may not assume or assign the License Agreement under section 365 or sell it under section 363.

**18.** The Debtors/Trustee, and NationsCredit, assert that even if they cannot assume and assign the License Agreement to Xircom under section 365, they can still accomplish the same result through a plan. They argue that they can formulate a plan by which the stock of one or more of the Debtors/Trustee is conveyed to Xircom, thereby giving it rights in the License Agreement. Since the Debtors/Trustee cannot assume the License Agreement, we do not see how this can be accomplished.